**UNITED STATES of America, Plaintiff,**

v.

**Robert Grady HEAD, Jr., Darlene Fife, and Southern Louisiana Media, Inc., Defendants.**

**Crim. A. No. 32036.**

United States District Court, E. D. Louisiana, New Orleans Division.

Sept. 1, 1970.

Michael H. Ellis, Asst. U. S. Atty., for plaintiff.

John S. Martin, New York City, Richard B. Sobol, Washington, D. C., George M. Strickler, New Orleans, La., for defendants.

RUBIN, District Judge:

This case, reportedly the first prosecution of an underground newspaper under the federal obscenity laws, is before the court on a motion to dismiss the indictment. The defendants publish NOLA Express, a radical biweekly that circulates mainly in the New Orleans metropolitan area. The newspaper is distributed primarily through street vendors, most of them young people living in New Orleans' French Quarter, but a number of papers are mailed to subscribers. Miss Fife, Mr. Head and Southern Louisiana Media, Inc. are charged with violating 18 U.S.C. § 1461 (knowing use of the mails for the delivery of obscene matter) in connection with the mail distribution of issue no. 43 of NOLA Express, the November 21-December 4, 1969 edition. The indictment charges that page 16 of that paper "contained an obscene, lewd, indecent, filthy and vile matter;" what the United

States Attorney and the Grand Jury were particularly concerned about was a picture on that page of a nude, long-haired young man masturbating in front of a wall covered with nude female pin-ups.

The defendants challenge the indictment as unconstitutional, contending that the obscenity statute is being used here to infringe their freedom of expression. They argue primarily that the prosecution must be stopped, because their newspaper was not obscene; in addition they contend that the issue of obscenity should have been determined in an adversary hearing before it could be submitted to the grand jury for indictment.[1]

## I. CAN THE CONSTITUTIONAL CHALLENGE TO THE INDICTMENT BE CONSIDERED BEFORE TRIAL?

Rule 12 of the Federal Rules of Criminal Procedure permits "any defense or objection which is capable of determination without the trial of the general issue [to be] raised before trial by motion." The constitutionality of the statute upon which an indictment is based is, of course, an issue properly heard on motion to dismiss, as is the allegation that the indictment fails to charge an offense under the laws.[2] In this case, the indictment identifies with great specificity the matter alleged to be unmailable; if it is clear on the face of the indictment that the material was constitutionally protected and therefore mailable within the terms of the statute, then the indictment charges defendants only with doing a legal act, and it adds nothing to the charge to cite the statute.

Moreover, while the defendants do not here specifically contest the facial constitutionality of the statute under which they are charged, the essence of their motion is that the statute is unconstitutional as applied to them. When a defendant is charged with violating a criminal obscenity law the threshold constitutional question resembles the ultimate factual question: is this material obscene? The judge has a duty to protect the constitutional rights of defendants who assert the protection of the First Amendment that requires him, when the issue is properly presented, to pass on the constitutional adequacy of the evidence before it can be submitted to the jury on the question whether the statute was violated. His decision is a constitutional one.[3]

1. This court's view of the prior adversary hearing issue, as a constitutional matter, is set forth at length in the dissenting opinion in Delta Book Distributors, Inc. v. Cronvich, E.D.La.1969, 304 F.Supp. 662, 673–76.

   At the hearing on April 29, 1970, the court ruled orally that defendants' contention that this prosecution violates the injunction entered by another section of this court against certain actions by state officials should properly be raised in contempt proceedings brought before that judge to enforce his order, rather than on this motion to dismiss.

2. 1 Wright, Federal Practice and Procedure (1969) §§ 193, 194.

3. See, for instance, Justice Brennan's opinion in Jacobellis v. State of Ohio, 1964, 378 U.S. 184, 188, 84 S.Ct. 1676, 1678, 12 L.Ed.2d 793, where he stated, "Since it is only 'obscenity' that is excluded from constitutional protection, the question whether a particular work is obscene

necessarily implicates an issue of constitutional law." Of course, he was referring to the Supreme Court's power to review a jury verdict, but the issue is one "of constitutional law," determinable by a judge whenever it is raised in the proceedings.

   In libel actions where the New York Times v. Sullivan [376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)] rule applies, the Fifth Circuit has held, "[A]ctual malice is a constitutional issue to be decided initially by the trial judge," Bon Air Hotel, Inc. v. Time, Inc., 5 Cir. 1970, 426 F.2d 858, 864. Discussing the importance of the trial judge's obligation to resolve the constitutional issue at the earliest possible point in the proceedings, where the First Amendment is involved, the court concluded, in the words of the D. C. Circuit: " 'In the First Amendment area, summary procedures are even more essential. For the stake here, if harassment succeeds, is free debate * * *,'" Washington Post Co. v.

Once the judge has determined that the First Amendment does not protect the material involved, the "general issue" that the jury must decide is whether the publications were "unmailable" under the statute. It can decide only the statutory question. The term "general issue," as used in Rule 12, necessarily refers to those questions of fact that a jury is constitutionally permitted to decide, those inferences and conclusions that the constitution permits them to draw from evidence that the constitution permits them to consider.

The decision on the protected nature of the picture in question here need not await trial of the merits. The entire newspaper is before the court, as part of the indictment that describes it. In response to a motion for a bill of particulars, the government stated that it did not plan to introduce evidence relative to "pandering," so that is not a relevant consideration in this case.[4] Thus the question of obscenity depends solely on the contents of the newspaper itself. Because of the direct burden on defend-

ants' First Amendment rights that would be caused by maintaining criminal proceedings if they were inevitably destined to prove futile,[5] the court is required to rule on the constitutional question of obscenity vel non when that issue is properly presented in advance of trial, as it is in this case.[6]

## II. MAY THE MATERIAL ON PAGE 16 BE JUDGED IN ISOLATION, OR DOES A VIOLATION DEPEND ON THE OBSCENITY OF ISSUE 43 AS A WHOLE?

The indictment charges the defendants with mailing "nonmailable matter, that is, a publication entitled 'NOLA Express,' Issue No. 43, * * * and page 16 of said publication contained an obscene, lewd, indecent, filthy and vile matter." Thus, on its face, the indictment seems to charge defendants with a crime because they mailed the entire issue, which was presumably considered "tainted" by the matter on page 16. If so, its sufficiency would depend on the possibility that the entire issue could be

Keogh, 1966, 125 U.S.App.D.C. 32, 365 F.2d 965, 968, quoted in Bon Air Hotel, Inc. v. Time, Inc., *supra*, at 865.

Constitutionally, libelous and obscene statements share the same lack of protection, and statements alleged to be either libelous or obscene are entitled to the same stringent examination before found to be beyond the First Amendment. Of course, *Bon Air Hotel* was a civil case, disposed of on summary judgment under the Federal Rules of Civil Procedure, but clearly the First Amendment requires at least equal solicitude in a criminal case, where the consequence of expression can be imprisonment rather than simply the payment of monetary damages.

4. Ginzburg v. United States, 1966, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31, stands for the proposition that questionable material can be held obscene if it was promoted and sold as pornography. Thus, the producer's behavior vis-a-vis his publication is an element of a violation of 18 U.S.C. § 1461 in some cases, and the government may introduce evidence to show that defendant acted with "the leer of the sensualist." However, the government's response to the motion for a bill of particulars in the instant

case indicates that pandering is not an element of the offense charged here.

5. Aside from any question of the "chilling effect" that may be implicit in any prosecution for exercising First Amendment rights, the criminal process necessarily imposes certain restrictions on the accused, before and during trial. For example, they are under public accusation of committing a felony; their freedom of movement is limited by the conditions of their bail; they must devote time, effort and expense to preparing for trial; and, in this case, the valuable real estate that secured defendants' property bonds has been encumbered by the bond obligation for eight months.

6. *The court's duty to rule on an issue properly presented by defendant on a motion to dismiss does not imply an obligation on the accused to raise all of his defenses prior to trial. The defendant is master of the manner of presentation of his defenses, and, aside from those matters specified in Rule 12(b) (2), neither the United States Attorney nor the court itself can compel adjudication of a particular issue at a particular point in the proceedings.*

termed obscene and beyond the reach of the First Amendment.

But the United States suggests that, if a jury could constitutionally find the material on page 16, taken alone, to be obscene, the indictment must stand regardless of the purpose or content of the rest of the newspaper;[7] the picture must be considered as if it were a separate and independent publication that happened to be included with other published matter for purposes of distribution. Apparently on the assumption that the indictment cites the whole issue merely for purposes of identification, but charges defendants only with the crime of mailing the picture, it contends that the obscenity of the picture, evaluated on its own, can support a conviction.

However, the constitutional shield that protects legitimate expression from governmental obscenity statutes appears to resolve the dispute, regardless of the interpretation put on this indictment. Although there has been considerable difference of opinion among the members of the Supreme Court over the various tests for obscenity as well as its constitutional status, that Court has been consistently unanimous on the proposition that material must be judged as a whole in order to determine whether it is obscene, before it can be suppressed because it contains offensive segments.

The rule that sexually explicit portions can "taint" a publication only if, in context, they render it salacious in its entirety, was embraced in the eloquent and influential opinions of Judge Woolsey and Judge Augustus Hand, in 1934, permitting James Joyce's *Ulysses* to be imported into the United States. Having found that in Joyce's work "each word of the book contributes like a bit of mosaic to the detail of the picture," Judge Woolsey concluded that "reading 'Ulysses' in its entirety, as a book must be read on such a test as this, did not tend to excite sexual impulses or lustful thoughts." United States v. One Book Called "Ulysses," S.D.N.Y.1933, 5 F. Supp. 182, 184, 185. In affirming that opinion, Judge Hand primarily dealt with the question whether isolated objectionable fragments could be relied upon to condemn an entire work. He found that "the book as a whole is not pornographic, and, while in a few spots it is coarse, blasphemous, and obscene, it does not, in our opinion, tend to promote lust. * * * The question in each case is whether a publication taken as a whole has a libidinous effect." United States v. One Book Entitled "Ulysses" by James Joyce, 2 Cir. 1934, 72 F.2d 705.[8]

The Supreme Court formally adopted this approach to the evaluation of expressive material in a case that did not deal with a venerated literary masterpiece, but with Sam Roth's mail-order trade in pulp novels.[9] Justice Brennan's opinion in Roth v. United States, 1957, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, represents the first attempt by the Supreme Court to set forth constitutional standards for distinguishing obscenity:

"The early leading standard of obscenity allowed material to be judged

---

7. In response to a Motion for a Bill of Particulars requesting that it "state whether the allegedly obscene matter is limited to that material contained on page number 16 * * *," the government replied, "the obscene matter is contained on Page No. 16 * * *" (Record, documents 17 and 18). Thus the government itself may not contend that the entire issue is obscene.

8. See also, the opinions permitting D. H. Lawrence's *Lady Chatterley's Lover* to be distributed through the mails, Grove Press, Inc. v. Christenberry, S.D.N.Y. 1959, 175 F.Supp. 488, affirmed 2 Cir. 1960, 276 F.2d 433.

9. The question had been presented to the Court earlier in that same term, in Butler v. Michigan, 1957, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412, but it did not reach the issue, choosing instead to reverse on the basis of the unconstitutionality of another element of the *Hicklin* test—that material could be banned entirely if offensive simply to minors or persons peculiarly susceptible.

merely by the effect of an isolated excerpt upon particularly susceptible persons. Regina v. Hicklin, [1868] L.R. 3 Q.B. 360. Some American courts adopted this standard but later decisions have rejected it and substituted this test: whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest. The Hicklin test * * * must be rejected as unconstitutionally restrictive of the freedoms of speech and press," *id.*, at 488–489, 77 S.Ct. at 1311.

The government would distinguish what purports to be a novel, even one of *Roth's* ilk, from a newspaper. According to its theory, a newspaper containing a number of separate articles is simply a package of separate publications, like the advertisements and excerpts mailed together in one envelope in Kahm v. United States, 5 Cir. 1962, 300 F.2d 78. Under this reasoning, to consider a newspaper such as NOLA Express as a single unit of expression would be to slide down to the bottom of the slippery slope envisioned by the argument that patent obscenity might be insulated by sticking a copy of the Declaration of Independence in a pocket part.

A publication is not obscene merely because it contains a blunt, Anglo Saxon word. The Old Testament contains passages of sexual candor, and four-letter words are not used for the first time in the literature of the seventies.

It is true that the First Circuit has held, in Flying Eagle Publications, Inc. v. United States, 1 Cir. 1960, 273 F.2d 799, affirmed on rehearing, 1 Cir. 1961, 285 F.2d 307, that 18 U.S.C. § 1461 punished the mailing of a pornographic picture contained in a magazine with other articles not constitutionally obscene.[10] With deference, I must decline to follow the literal terms of these opinions, for their application must be modified in the light of subsequent development of the law in this area.

In Ginzburg v. United States, 1966, 383 U.S. 463, 469, 86 S.Ct. 942, 16 L. Ed.2d 31, the Supreme Court expressly held that the obscenity of a magazine composed of several articles and illustrations depended on the effect produced by the publication as a whole, even though some of the items were obscene and some were not. *Id.* at 471, 86 S.Ct. 942.[11] Indeed, despite their disagreements, as expressed in five separate opinions, all the Justices implicitly agreed that the *context* in which material was presented was crucial to its characterization as protected or obscene. They differed with respect to the degree to which a court could look beyond the publication itself to convict the publisher for the prurient expectations and aura of pornography created by his promotional activities.

Ginzburg's EROS was a magazine proclaimed by its publisher to be "devot-

---

10. The fact that these opinions were cited by the Fifth Circuit in a footnote in Kahm v. United States, 1962, 300 F.2d 78, does not add anything to the government's reliance on them in this case. *Kahm* sets forth the rule that *unrelated* innocuous material included in the same package with obscene booklets and circulars does not insulate the latter. In fact, the Court of Appeals held in *Kahm* that "the appellant in merely selecting the most obscene passages from various books has seen to it that his readers are not subjected to any book as a whole * * * consideration of the other extracts and enclosures but serves to * * *

demonstrate that the mailed material 'taken as a whole' served no purpose whatever except to purvey obscenity," *id.* at 83.

11. In footnote 5, p. 466, 86 S.Ct. p. 945, Justice Brennan stated: "Our affirmance of the convictions for mailing EROS and Liaison is based upon their characteristics as a whole, including their editorial formats, and not upon particular articles contained, digested, or excerpted in them. Thus we do not decide whether particular articles * * * should be condemned as obscene whatever their setting."

ed to the subjects of Love and Sex." [12] Its fifteen articles purported to treat these themes in different ways, and four of them were found to appeal predominantly to prurient interest. Therefore its editor-publisher was convicted of violating 18 U.S.C. § 1461 because the magazine as a whole "was created, represented and sold solely as a claimed instrument of the sexual stimulation it would bring," 471, 86 S.Ct. at 947. NOLA Express is a newspaper devoted to radical social and political commentary. It apparently seeks to challenge, and to advocate departures from, the style of life now socially accepted by the nation's middle class. The issue charged in this indictment contains a number of articles, short stories, advertisements and letters, all of them related in some way to criticism of the quality of American life. The government has cited only one of these items as obscene. Surely the criteria used to adjudge Ralph Ginzburg's material obscene must be employed here, even if the result is dismissal of charges rather than conviction.

### III. WAS THE PUBLICATION OBSCENE?

The criteria we must apply in determining obscenity can be briefly stated. *Roth* sets forth the general test: is the dominant theme of the material, taken as a whole, an appeal to the prurient interest of the average member of the community? The *Fanny Hill* decision [13] asks, as an independent factor, is the material utterly without redeeming social value? *Jacobellis* and *Mishkin* [14] demonstrate that "patent offensiveness" as well as erotic effect is an element of the "prurient appeal" that characterizes obscenity, and *Ginzburg* includes the

publisher's intent and promotional activities as an element of the crime in some cases.

A casual glance at the issue of NOLA Express included in the indictment shows that by no reasonable standard can the newspaper as a whole be held outside the protection of the First Amendment. Although several other items besides the picture in question advert to sexual matters, and Anglo-Saxon and colloquial words are used to refer to human organs, bodily functions and sexual relations, the sixteen-page newspaper is devoted predominantly to libidinally neutral news reports, poetry, artwork and discussions of topics generally of interest to the particular community that the newspaper seeks to serve. Contrary to the government's assertions, it is remarkably uniform in its approach to its general subject—the assumed foibles of the way of life generally accepted in this country today. Because it is a newspaper it is comprised of discrete articles, but it is more thematically integrated than most magazines or newspapers of general circulation and, in this regard, it adopts a single point of view of life, much like a novel or a film.

Critics of the established order have frequently found it necessary to use language that shocked their audiences—neither Ezekiel nor Martin Luther spoke in bland terms. The defendants in this case were engaged in another kind of social and political criticism: they were attempting to expose what they consider hypocritical and venal in everyday life. They used emphatic, shocking and disturbing language and techniques of communication in their paper both to express their own depth of indignation and to arouse their audience. While their editorial format may be experimental,

12. *Ginzburg, supra,* p. 468, 86 S.Ct. p. 946, footnote 9.

13. A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of the Commonwealth of Massachusetts, 1966, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1.

14. Jacobellis v. Ohio, 1964, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793; Mishkin v. State of New York, 1966, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56.

their objective is serious. Another section of this court has held that the First Amendment protects defendants and their street vendors from arrest and harassment by state authorities.[15] The United States is at least equally constrained by the Constitution.

It is not necessary to determine whether the defendants could be prosecuted solely for including an obscene entry in their newspaper. But, if it were, the photograph on page 16 must itself be appraised as a whole. A nude man is presented as an illustration to an advertisement for Playboy Magazine. The text is copied verbatim from a Playboy advertisement published in newspapers of general circulation. It asks, "What sort of a man reads Playboy?" The photograph is the answer offered by NOLA Express.

The picture is indeed shocking and repellant; it seeks precisely to arouse shock and disgust at Playboy and at the social outlook that magazine represents.[16] It is fair to say that it would be patently offensive to any general audience. But offensiveness alone does not constitute obscenity in the con-

stitutional sense. The first requisite is that the dominant theme be appeal to prurient interest, and the commentary accompanying the picture demonstrates that its intent was not to arouse lustful instincts but to ridicule other publications that do attempt such an appeal.

Whether a publication has "socially redeeming value" is not determined by whether judges or juries think it expresses a worthwhile or beneficial point of view, as the Justices of the Supreme Court have many times repeated. A publication is deemed to have social importance if it is a sincere contribution to public discussion of "all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period," Thornhill v. Alabama, 1940, 310 U. S. 88, 102, 60 S.Ct. 736, 744, 84 L.Ed. 1093, quoted in *Roth, supra,* 354 U.S. at 488, 77 S.Ct. 1304, 1 L.Ed.2d 1498. Utterances made not to exploit but to explore can have such value, whether they prove their point or simply demonstrate their own absurdity. Anything that sufficiently challenges the foundations of our own point of view may be repug-

15. On December 12, 1969, Judge Herbert W. Christenberry entered an injunction *against the District Attorney for the* Parish of Orleans, the City Attorney for the City of New Orleans, the Chief of Police for the City of New Orleans and two individual policemen, ordering them "and their officers, servants and agents and employees" to refrain, among other things, "from any and all interference, harassment, intimidation or any and all other efforts which deter plaintiffs, intervenors or any other persons from the public sale or distribution of published materials of any nature at any place within the jurisdiction of this court," Fowler v. Garrison (unreported), E.D.La. 1969, Docket No. 69–2575. That was a suit brought under 42 U.S.C. § 1983 by several NOLA Express street vendors, in which the individual defendants here intervened *as plaintiffs, to enjoin state* criminal action pending against them because of the same issue of NOLA Express now the subject of this federal

prosecution. The court can of course take judicial notice of this order.

16. Defendants' brief points out that this material was prepared by the Women's Liberation organization at Grinnell College. Through irony, it attempts to illustrate a major premise of one group in the contemporary women's movement: *that the prevailing concept of relations* between the sexes is harmful to both men and women, see, *e. g.,* "No More Fun & Games: A Journal of Female Liberation," issue no. 3, November, 1969. It is addressed particularly to the conviction that "[a] tendency toward the reification of the female makes her more often a sexual object than a person," Millett, Sexual Politics (1970) 54.

The same issue of NOLA Express contains another industrial advertisement, reproduced apparently without alteration. This promotes trading stamps, and the heading reads, "Capitalize on the Most Powerful Sales Incentive Ever Devised by Man: Woman."

nant. The whole thrust of the First Amendment is to shelter expression from the value judgments of those in power; when any judge or prosecutor attempts to assess speech, he must do so in his own coin—a coin that is by definition suspect.[17] "While [the First Amendment] is part of our system I think that we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless * * * an immediate check is required to save the country." Holmes, J., dissenting in Abrams v. United States, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173.

In Grove Press, Inc. v. Christenberry, 2 Cir. 1960, 276 F.2d 433, Judge Clark affirmed the district court's injunction against the Post Office Department's interference with mail distribution of *Lady Chatterley's Lover*. "Obviously," he said, "a writer can employ various means to achieve the effect he has in mind, and so probably Lawrence could have omitted some of the passages found 'smutty' by the Postmaster General and yet have produced an effective work of literature. But clearly it would not have been the book he planned. * * *" *id.*, at 438.

As a literary matter, NOLA Express does not belong on the same library shelf as *Ulysses* or *Lady Chatterley's Lover*. But it is newsprint, evidently intended for social commentary rather than artistic achievement. It represents a relatively new medium of political and social discussion in this country, sometimes called the underground press. In their newspaper, defendants urge a radical departure from the generally accepted way of life, and they use new and radical means of expressing their point of view.[18] Judge Clark's conclusion with regard to the banning of *Lady Chatterley* from the mails is directly applicable here:

> "In short, all these passages to which the [United States Attorney] takes exception—in bulk only a portion of the book—are subordinate, but highly useful, elements to the development of the author's central purpose. And that is not prurient." *id.* at 439.

For these reasons I hold that the material that defendants are charged with mailing was constitutionally protected, and that therefore the indictment must be dismissed.

---

17. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion," Justice Jackson writing for the Court in West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628.

18. In his opinion clearing Ulysses for entry into the United States, Judge Woolsey laid great emphasis on the development by Joyce of a new literary genre, designed to illustrate "the screen of consciousness with its ever-shifting kaleidoscopic impressions," United States v. One Book Called "Ulysses," *supra*, 5 F.Supp. at 183. He found that "because Joyce * * * has honestly attempted to tell fully what his characters think about, * * * [he was artistically required] to use certain words which are generally considered dirty words and * * * what many think is a too poignant preoccupation with sex in the thoughts of his characters." Nevertheless, the sincerity and seriousness of the attempt justified the unusual candor.